**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| IN RE:<br><br>Delores Yvette Mitchell,<br><br>Debtor(s). | C/A No. 26-01910-EG<br><br>Chapter 13 |
| IN RE:<br><br>Felton Lighty, Jr.,<br><br>Debtor(s). | C/A No. 26-02101-EG<br><br>Chapter 13 |

# ORDER DENYING CONFIRMATION

**THIS MATTER** comes before the Court on the objection of the Chapter 13 Trustee (the "Trustee") to confirmation (the "Objection") of the chapter 13 plans filed by spouses Delores Yvette Mitchell ("Mitchell") and Felton Lighty, Jr. ("Lighty" and, collectively, "Debtors").[1] The Trustee objected on the grounds that Debtors failed to satisfy the good-faith requirements of 11 U.S.C. §§ 1325(a)(3) and (a)(7).[2] Debtors each filed a brief in support of confirmation and in opposition to the Objection,[3] and the Trustee filed a brief in support of her Objection.[4] The parties also filed a Joint Statement of Dispute and Stipulation outlining the issues for trial and identifying the witnesses and stipulated exhibits to be presented.[5] Although Debtors filed separate and distinct bankruptcy cases, because of the significant overlap in the facts and circumstances arising from

[1] C/A No. 26-01910, ECF No. 8; C/A No. 26-02101, ECF No. 7.
[2] C/A No. 26-01910, ECF No. 16; C/A No. 26-02101, ECF No. 21.
[3] C/A No. 26-01910, ECF No. 20; C/A No. 26-02101, ECF No. 25.
[4] C/A No. 26-01910, ECF No. 21; C/A No. 26-02101, ECF No. 26.
[5] C/A No. 26-01910, ECF No. 24; C/A No. 26-02101, ECF No. 31.

their marital relationship, the parties submitted virtually identical briefs and Joint Statements of Dispute in each case. Debtors, Debtors' counsel,[6] the Trustee, and Trustee's counsel were all present at the hearing on August 4, 2026, and agreed that the matters should be jointly heard and adjudicated. This Court has jurisdiction over these matters pursuant to 28 U.S.C. § 1334 and this is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (L).

Debtors have combined gross monthly income exceeding $15,000.00. Approximately $8,900.00 of their income consists of benefits excluded from the definition of "current monthly income" for purposes of determining the applicable commitment period and payments required to be made to unsecured creditors under a chapter 13 plan. Although Debtors contend that the Trustee's position is contrary to controlling Fourth Circuit precedent and that the Trustee misapplies the Fourth Circuit's recent decision in *Goddard v. Burnett*, the issue presented is ultimately a straightforward one of good faith under § 1325(a). Notwithstanding their substantial tax liabilities and fixed income, within two years of filing their bankruptcy petitions, Debtors constructed a home valued at nearly $900,000.00 and assumed a mortgage obligation requiring monthly payments of approximately $5,000.00. During the same period, they also incurred approximately $100,000.00 in unsecured debt and an additional $100,000.00 to construct a pool. In addition, Debtors incurred new debt secured by a vehicle that had been previously paid in full and refinanced a loan secured by a second home, thereby eliminating equity in that property. Against this background, Debtors' proposed plans would provide unsecured creditors with only a minimal recovery on their allowed claims.

The fact that Debtors are below-median and that a substantial portion of their income consists of Social Security and VA disability benefits, does not, standing alone, resolve the good-

[6] Debtors are represented by the same counsel in their respective bankruptcy cases.

faith inquiry. The Court must consider the totality of the circumstances presented in determining whether the cases were filed and the plans proposed in good faith. Considering the record as a whole, the Court concludes that Debtors' plans fall short of the good-faith requirement of § 1325(a)(3).

## FACTUAL BACKGROUND

Mitchell filed a voluntary petition for relief under chapter 13 of the Bankruptcy Code on April 30, 2026 (C/A No. 26-01910).[7] Lighty, Mitchell's spouse, filed a voluntary chapter 13 petition on May 8, 2026 (C/A No. 26-02101-eg).[8] Neither case appears to have been prompted by a pending foreclosure action or vehicle repossession. Lighty testified that they decided to contact an attorney to discuss bankruptcy between April and May of 2026. According to Debtors' Counsel, the pending cases were filed separately because Debtors' assets were titled separately, they had no joint unsecured debts, and they wanted to avoid complications during the bankruptcy case in the event of a divorce or death of a debtor. This is Lighty's second chapter 13 filing. He filed a prior chapter 13 case on January 26, 2017 (C/A No. 17-00361-dd), with the assistance of his current counsel, and received a discharge on February 16, 2022.[9]

### *Income and Expenses*

Mitchell and Lighty married on November 5, 2025, but have been living together since Mitchell moved to South Carolina in 2020 upon her retirement from the New York City Police Department. Both Debtors are retired. According to Schedule I filed in their respective cases, Debtors have the following monthly sources of income:

---

[7] C/A No. 26-01910, ECF No. 1.
[8] C/A No. 26-02101, ECF No. 1.
[9] According to the Trustee, the amount of unsecured claims discharged in Lighty's prior case was $82,208.24, and his general unsecured creditors received a distribution through the plan of approximately 11.9%. *See* C/A No. 17- 00361-dd, ECF No. 44.

| | | |
|---|---|---|
| Lighty's Income Sources: | Social Security:<br>Pension:<br>VA Disability:<br>Rental net income: | $2,421.00<br>$807.66<br>$2,559.30<br>$201.28 |
| Mitchell's Income Sources | Pension:<br>Social Security: | $5,428.86<br>$3,648.00 |
| **Combined Total Income (All Sources)** | | $15,066.10 |
| **Combined Current Monthly Income (as defined in 11 U.S.C. § 101(10A)(B)(ii))** | | $6,437.80 |

Because the majority of their income comes from sources excluded from bankruptcy calculations under 11 U.S.C. § 101(10A)(B)(ii), Debtors are considered below-median debtors in South Carolina pursuant to 11 U.S.C. § 1325(b)((3).[10] Therefore, their amounts reasonably necessary to be expended pursuant to 11 U.S.C. § 1325(b) are calculated as their actual expenses. Debtors claim monthly household expenses totaling $9,254.32, which exceed Debtors' income from non-excluded sources under 11 U.S.C. § 101(10A)(B)(ii). Those expenditures include: a $4,999.86 mortgage payment on their main residence; $200.00 for home maintenance; $825.00 for utilities; $944.00 for food and housekeeping supplies; $500.00 for transportation expenses; $200.00 for clothing, laundry, and dry cleaning; $200.00 for personal care products and services; $160.00 for medical and dental expenses; $200.00 for entertainment; $118.75 for life insurance; and $906.71 for vehicle insurance.[11]

---

[10] The median income for a household of two in South Carolina at the time of the filing of the petitions was $83,761.00. *See* Census Bureau Median Family Income By Family Size (Cases Filed Between April 1, 2026, and July 14, 2026, Inclusive), U.S. Dep't of Just., https://www.justice.gov/ust/eo/bapcpa/20260401/bci_data/median_income_table.htm (last visited Aug. 19, 2026).

[11] Exs. 1 and 2.

Although Debtors share identical living expenses, their respective Schedules J include the monthly plan payments proposed by the other spouse—$650.00 deducted for Lighty and $1,600.00 deducted for Mitchell. As a result, Mitchell's Schedule J reflects monthly net income of $5,126.78 whereas Lighty's reflects $4,211.78. Without accounting for their social security and VA disability income, Debtors have a deficit of -$2,816.52, which increases to -$5,066.52 when including their combined proposed plan payments of $2,250.00. Although Debtors have significant income available to pay more to unsecured creditors, Debtors argue that their plans were proposed in good faith and are confirmable because their Social Security and VA disability benefits are excluded from the calculation of disposable income.

*Hallie Drive Property*

Lighty is the owner of a three-bedroom and two-bathroom home at 1151 Hallie Drive, Florence, South Carolina, which was purchased on January 20, 2015 (the "Hallie Drive Property") and is currently used as rental property. Lighty receives $1,800.00 per month in rent for this property. According to Debtors' schedules, the Hallie Drive Property is valued at $225,600.00 and is encumbered by a mortgage to Freedom Mortgage in the amount of $227,236.40.[12] The monthly mortgage payment on the property is $1,598.71, including insurance and taxes, leaving $201.29 in net rental income. However, Lighty testified that the net rental income is further offset by the cost of a home warranty for the property, resulting in essentially no net income. According to Lighty, he transferred an ownership interest in the Hallie Drive Property to Mitchell in 2018.[13]

[12] *See* Proof of Claim 29-1 filed in C/A No. 26-02101-eg. Lighty's Schedules listed the claim owed to Freedom Mortgage at $228,546.00.

[13] The Court notes that the 2025 property tax record for the Hallie Drive Property (Ex. 12) lists only Lighty as owner of the property and none of the subsequent refinances and modifications of the mortgage reflect Mitchell's ownership interest. However, Debtors both indicated on their respective Schedules A/B and at the hearing that the Hallie Drive Property was co-owned. Exs. 1, 2.

Lighty refinanced the mortgage on the Hallie Drive Property multiple times since 2015. The original mortgage on the property was held by First Reliance Bank, securing a note in the original principal amount of $119,001.00 with interest at the rate of 3.875% and a maturity date of February 1, 2045.[14] The mortgage was subsequently assigned to Branch Banking & Trust Company ("BB&T").[15] On or about August 2, 2021, during Lighty's prior bankruptcy case, he entered into a loan modification agreement with Truist Bank, BB&T's successor by merger, increasing the principal balance due from $104,063.31 to $112,405.46 with interest at the rate of 3.375% and a maturity date of August 1, 2051.[16] According to Lighty, the purpose of the loan modification was to account for a forbearance that occurred during the bankruptcy case.

At trial, Lighty testified that, in May of 2022, after receiving a discharge in his first bankruptcy case, he refinanced the mortgage on the Hallie Drive Property. He testified that the refinancing resulted in an increased interest rate, although he could not recall the rate. No documentation concerning the 2022 refinancing was introduced into the record. On or about January 31, 2025, Lighty refinanced the mortgage on the Hallie Drive Property again, executing a promissory note in favor of Freedom Mortgage in the principal amount of $215,597.00, bearing interest at the rate of 6.375%, monthly principal payments of $1,345.05, and a maturity date of February 1, 2055. Although Lighty testified that this refinance was to lower the interest rate, as indicated above, no documents were introduced to support the reduction in interest rate from the 2022 refinancing. Lighty further testified that he had been making his mortgage payments before the refinancing and that he did not personally receive any money from the transaction. Between

[14] C/A No. 17-00361-dd, Proof of Claim No. 3-1.

[15] Ex. 16.

[16] *Id.* As the Loan Modification Agreement noted, prior to the modification, the outstanding unpaid principal balance due under the note and security agreement was $104,063.31. Because of interest accruing as well as advanced taxes and insurance premiums—in the total amount of $8,342.15—the total indebtedness increased.

2022 and 2025, both the balance of the loan and interest rate nearly doubled for reasons that remain unclear to the Court[17] On cross-examination, he was unable to provide a satisfactory explanation for why the loan's principal balance had increased by more than $100,000.00 since 2021. Overall, his testimony regarding the refinancings between 2021 and 2025 was unclear and, at times, difficult to reconcile.

On or about February 3, 2026, Lighty entered into yet another loan modification agreement with Freedom Mortgage, increasing the principal balance due to $228,576.72, with interest at 6.625%, and extending the maturity date to March 1, 2066.[18] Although Lighty testified that the purpose of this loan modification was to lower the monthly payments, the documents introduced into evidence indicate that the monthly payment increased to $1,598.72 ($1,358.62 principal and interest plus $240.10 for escrowed amounts) and the interest rate increased by 0.25%. At the time of the filing of Debtors' bankruptcy cases, the payments to Freedom Mortgage Corporation for the Hallie Drive Property were current.

*Sheffield Drive Property*

In 2017, before Debtors married and during his first bankruptcy case, Lighty bought land at 1323 Sheffield Drive in Florence, South Carolina (the "Sheffield Drive Property").[19] He testified he purchased the property in anticipation of Mitchell's retirement and relocation to South Carolina, at which time they planned to build their "dream house," including a pool and sufficient space to accommodate their grandchildren and other family members during extended visits. According to Mitchell, they began putting money into a savings account for their "dream house."

---

[17] Ex. 11.
[18] *Id.* at 43.
[19] The Court takes judicial notice from public documents filed with the Florence County Register of Deeds that a third party conveyed the Sheffield Drive Property to Lighty and Mitchell, as joint tenants, by deed recorded on November 14, 2017 for $25,000.00, while Lighty's bankruptcy case was pending.

Lighty testified that around April of 2018, he transferred his interest in the Sheffield Drive Property to Mitchell, and it remains titled in Mitchell's name only. Before beginning construction on the new house, Lighty testified they engaged in financial planning through the Department of Veterans Affairs and consulted with a representative regarding their ability to meet the anticipated monthly loan payments. According to Lighty, the financial planner advised they could afford the new house while retaining the Hallie Drive Property. Lighty acknowledged, however, that the assessment was based on Debtor's financial circumstances before construction began, when their overall debt was substantially lower than it was when they filed for bankruptcy.

Around May of 2024, Debtors obtained a loan from Weststar Mortgage Corp. to cover the construction of the custom-built home, which began in May of 2024 and was completed on December 27, 2024. The completed house has five bedrooms, four bathrooms, and an in-ground pool.[20] During construction, Debtors testified that several unexpected expenses increased the estimated cost of the project. These included: (1) soil tests; (2) additional surveys and architectural redesign, which were required due to the discovery of wetlands, a wildlife preserve, and county sewer line on or adjacent to the property; (3) a double foundation required by Florence County engineers; (4) a fence to separate the property from the wildlife preserve; (5) installation of gutters; and (6) an oval driveway, which Debtors testified was necessary due to the location of the sewer line on the lot. Lighty testified that the foundation and driveway cost approximately $27,000.00, the overage owed to the builder was approximately $10,000.00, the resurvey and soil testing cost $3,800.00, and the architect's redesign fee was $4,700.00. Mitchell testified that they had to purchase gutters for the house costing $15,000.00 to prevent foundation damage from rainwater, which she first testified were paid for using her credit card but later stated that she did not use

[20] Ex. 12.

credit cards for the unexpected construction expenses. Overall, Debtors' testimony regarding the unexpected expenses lacked clarity and consistency. According to their testimony, they used their saved funds to pay for the unexpected costs that were not covered by the construction loan and used credit cards to buy furniture for the house; pay for moving expenses, living expenses, vet bills, and medicine for Lighty's ninety-one-year-old father; and purchase a storage shed.

Mitchell's schedules reflect that the Sheffield Drive Property has a value of $871,100.00, with a mortgage in favor of Weststar Mortgage Corp. in the amount of $638,739.00.[21] Although the Sheffield Drive Property is deeded solely in Mitchell's name, Lighty is also obligated on the mortgage. The monthly mortgage payment on the Sheffield Drive Property is $4,999.86.[22] At the time of the filing of Debtors' bankruptcy cases, Debtors were one month behind in their mortgage payments to Weststar Mortgage Corp.

During the construction, on October 26, 2024, Mitchell also entered into two separate Retail Installment Contracts and Security Agreements with Foundation Finance Company to finance the construction of a pool and its foundation on the Sheffield Drive Property, in the amounts of $65,426.16 and $28,039.76, respectively.[23] Despite the unexpected costs incurred at the beginning of the construction, Mitchell testified that she never considered changing her plans to build the pool.

*Recent Debts Incurred*

Lighty's Schedules reflect secured debt of approximately $900,000 and unsecured debt of approximately $83,000.00. Mitchell's schedules reflect secured claims of nearly $775,000.00,

---

[21] Weststar Mortgage Corp. has not filed a proof of claim in Debtors' bankruptcy cases. On August 11, 2026, however, Debtor's counsel filed a proof of claim on the mortgage company's behalf, which contains no supporting documentation. *See* Proof of Claim 17-1 (C/A No. 26-01910-eg).
[22] Exs. 1 and 2.
[23] Exs. 8 and 9. Foundation Finance Company filed proofs of claim in Mitchell's case asserting secured claims of $68,200.41 and $29,060.30, respectively. *See* Proof of Claim Nos. 6-1, 7-1.

priority claims of about $80,000.00, and unsecured debt of over $95,000.00, the majority of which were incurred between 2024 and 2025.

During 2024 and 2025, Debtors remained current on the expenses associated with the new house and pool. They testified, however, that their day-to-day living expenses increased due to inflation and rising costs. They relied on credit cards to pay for those living expenses, collectively incurring more than $100,000.00 in unsecured debts during that two-year period. Mitchell testified that she is currently enrolled in a marketing program at Francis Marion University, which she hopes to complete by 2028, with the goal of pursuing a career in that field. Mitchell testified that she had not yet determined the specific career she would pursue and acknowledged that she had failed two courses she had recently taken. According to her Schedule F, in 2025 Mitchell incurred approximately $16,000.00 in federal student loan debt. Debtors both testified that they did not incur their unsecured debts with the expectation that they would later file bankruptcy to discharge them.

Mitchell is the owner of a 2020 Jeep Wrangler (the "Jeep") valued at $27,328.00.[24] Although the Jeep was fully paid off, in August of 2025, Mitchell borrowed $25,123.77 from a title lender, OneMain Financial Group, LLC ("OneMain"), secured by the Jeep.[25] The loan agreement with OneMain requires Mitchell to pay interest at an annual percentage rate of 26.77% and make monthly payments of $704.30 per month for seventy-one months, after an initial payment of $741.66. OneMain filed a proof of claim in Mitchell's case in the amount of $27,104.25.[26] The information included in the proof of claim reflects that loan proceeds totaling $19,631.00 were paid to three creditors, and Mitchell received $5,369.00 in cash.

---

[24] Ex. 1.
[25] Ex. 10.
[26] C/A No. 26-01910-eg, Proof of Claim No. 2-1, filed May 18, 2026. OneMain asserts that $26,350.00 of its claim is secured by the Jeep and the remaining $754.25 is unsecured.

*Tax Debt*

Mitchell owes debts to the Internal Revenue Service ("IRS") for income taxes due from 2020 to 2025 totaling $79,242.98, comprised of an unsecured priority obligation of $20,027.90 and $59,215.08 in general unsecured debt.[27] Approximately $51,000 of the debt owed to the IRS is for the tax period from 2020 through 2023. She also owes debts to the South Carolina Department of Revenue for 2024 and 2025 taxes in the amount of $8,252.09.[28] Mitchell testified that her move to South Carolina in 2020 caused her some tax issues and that she received misinformation on how to roll over an IRA account, which caused her to have significant tax obligations for that year.

Mitchell's 2025 federal income tax return shows a $11,099.00 loss from a business described as "Other Transit & Ground Passenger Transportation." Mitchell testified that she began driving for DoorDash in 2025 to earn additional income but stopped when the work began to conflict with her school schedule. She testified that the loss reported on her 2025 tax return was related to her DoorDash employment. She further testified that, at her § 341 meeting of creditors, she stated that she did not have a business because she did not realize at that time that the Trustee's questions concerning a business were referring to her DoorDash activity.

*Personal Property*

In addition to the Jeep mentioned above, there are three other vehicles in the household owned by Lighty: (1) a 2007 Mercedes E350 valued at $3,490; (2) a 2011 Cadillac CTS valued at $1,975; and (3) a 2018 Jaguar F Type (the "Jaguar") valued at $23,700.00. According to Lighty's

[27] Proof of claim No. 8-1.
[28] Proof of claim No. 1-1.

Schedule D, the Jaguar is fully encumbered by a lien held by Langley Federal Credit Union ("Langley") in the amount of $28,989, which appears to have originated in February 2023.[29]

*Chapter 13 Plans*

Mitchell filed her chapter 13 plan on May 8, 2026 ("Mitchell's Plan").[30] Mitchell's Plan provides for: (1) payments to the Chapter 13 Trustee of $1,600.00 per month for fifty-eight months; (2) cure of the default on the mortgage by making monthly arrearage payments of $88.00 and maintenance of regular contractual payments on the mortgage directly to Weststar Mortgage Corp; (3) payments of $557.00 per month with interest at 8.25% to OneMain for the Jeep without valuation; (4) payments of $151.00 per month with interest at 8.25% to South Carolina Department of Revenue; (5) payments totaling $64.00 per month to Foundation Finance Company for the pool and pool foundation, valuing the two secured claims from their claim totaling approximately $95,000.00, to $3,000, combined;[31] and (6) surrender of a certificate of deposit to Municipal Credit Union.[32] The proofs of claim filed prior to the bar date in Mitchell's case reflect that she has over $120,000.00 in general unsecured claims in addition to unsecured amounts of $65,700.41 (pool) and $28,560.30 (pool foundation) resulting from the valuation of that collateral. According to the Trustee, general unsecured creditors are projected to receive approximately 3.6% in distributions under Mitchell's Plan.

Lighty's chapter 13 plan, also filed on May 8, 2026 ("Lighty's Plan"), provides for: (1) payments to the chapter 13 trustee of $685.00 per month for 58 months; (2) maintenance of regular mortgage payments on the Hallie Drive Property mortgage directly to Freedom Mortgage

[29] Ex. 2. Langley has not filed a proof of claim; however, Lighty's schedules indicate the loan was incurred in February of 2023.
[30] Ex. 3.
[31] According to the Proof of Claim, it appears that the assertion that the debts related to the pool are secured is based upon the filing of a UCC statement.
[32] *Id.*

Corporation; (3) maintenance of regular mortgage payments on the Sheffield Drive mortgage directly to Weststar Mortgage Corp; and (3) valuation of Langley's secured claim at $23,700.00 and payments of $497.00 per month with interest at 8.25% for the Jaguar. The proofs of claim filed in Lighty's case reflect that he has over $64,000.00 in general unsecured claims in addition to an unsecured amount of $5,289.00 on the vehicle being valued through his plan. The Trustee estimates that general unsecured creditors will receive approximately 2.6% in distributions under Lighty's Plan.

Debtors have both pledged a portion of their Social Security and VA disability income to fund their proposed plan and mortgage payment despite its exclusion from the projected disposable income test of 11 U.S.C. § 1325(b).

## CONCLUSIONS OF LAW

Section 1325(a)(1) of the Bankruptcy Code provides that "the court shall confirm a plan if . . . it complies with the provisions of this chapter and with the other applicable provisions of this title." 11 U.S.C. § 1325(a)(1). To confirm a chapter 13 plan, the Court must find that the plan satisfies each of the statutory requirements of § 1325(a), including "(3) the plan has been proposed in good faith and not by any means forbidden by law" and "(7) the action of the debtor in filing the petition was in good faith." 11 U.S.C. § 1325(a)(3), (7). The burden of proof for confirmation is a shifting burden. *In re Moore*, 635 B.R. 451, 453 (Bankr. D.S.C. 2021). The party objecting to confirmation bears the initial burden of proof of going forward with the evidence as to its objection. *Trantham v. Tate*, 112 F.4th 223 (4th Cir. 2024) (citing *Moore*, 635 B.R. at 453). Once this burden is met, "[t]he ultimate burden of proof is on the [d]ebtor, who must prove by a preponderance of the evidence that the plan complies with all the confirmation requirements,

including the good faith requirement." *In re Sherrod*, 660 B.R. 776, 790 (Bankr. D.S.C. 2024) (citing *In re Pizzo*, 628 B.R. 811, 818 (Bankr. D.S.C. 2021)). *See also In re Turner*, 665 B.R. 293 (Bankr. D.S.C. 2024) (the party objecting to confirmation must first establish a *prima facie* objection. If the objecting party makes such a *prima facie* showing, the debtor bears the ultimate burden of proving that the plan meets the requirements for confirmation); *In re Allawas*, No. 07-06058-HB, 2008 WL 6069662, at *3 (Bankr. D.S.C. Mar. 3, 2008).

Under § 1325(b), if the trustee objects to confirmation of a plan that does not provide for payment in full of unsecured claims, "the court may not approve the plan unless, as of the effective date of the plan . . . the plan provides that all of the debtor's *projected disposable income* to be received in the *applicable commitment period* beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan." 11 U.S.C. § 1325(b)(1)(B) (emphasis added). The primary differences in what any above-median income debtor must pay versus a below-median income debtor center on how "disposable income" is calculated and the required duration of the payment plan. *Pliler v. Stearns*, 747 F.3d 260, 266 (4th Cir. 2014).

"Disposable income" is defined as "current monthly income" less "amounts reasonably necessary to be expended for debtor's maintenance and support, for qualifying charitable contributions, and for necessary business expenditures." 11 U.S.C. § 1325(b)(2). "Current monthly income," in turn, is defined as "the average monthly income from all sources that the debtor receives . . . without regard to whether such income is taxable," but expressly excludes, among other types of benefits, ones received under the Social Security Act and VA disability benefits. *See* 11 U.S.C. § 101(10A).[33] For debtors whose annualized current monthly income is

[33] 11 U.S.C. § 101(10A) provides that the term "current monthly income" excludes from its definition:

below the state median, "amounts reasonably necessary to be expended" include the amounts needed for maintenance and support of the debtor and their dependents. For above-median debtors, on the other hand, the allowable expenses are limited by state and determined through the statutory "means test" set forth in 11 U.S.C. § 707. *See* 11 U.S.C. § 1325(b)(3). The "applicable commitment period" establishes the mandatory temporal duration over which the debtor must make plan payments, unless all allowed unsecured claims are paid in full over a shorter period. *See* 11 U.S.C. § 1325(b)(4). The commitment period is generally three years for debtors with below-median income and five years for above-median debtors.

In the two cases before the Court, the Trustee objects to confirmation of Debtors' plans on the grounds that Debtors have failed to satisfy the good faith requirement of 11 U.S.C. §§ 1325(a)(3) and (a)(7). The Trustee does not dispute the fact that Debtors are below-median income. However, as the Fourth Circuit recently highlighted in *Goddard v. Burnett*, 173 F.4th 550 (4th Cir. 2026), a debtor who satisfies the technical requirements of the means test yet proposes a plan to retain the benefit of debt they have no honest intention of repaying at the expense of their creditors may fail to meet the good faith requirements of § 1325(a). The Trustee has raised a *prima facie* objection that Debtors bear the ultimate burden to overcome.

Debtors contend that they have satisfied the requirement of providing all "disposable income" towards payments to unsecured creditors in accordance with § 1325(b)(2) because their

---

> (ii) (I) *benefits received under the Social Security Act* (42 U.S.C. 301 et seq.);
> . . .
> (IV) *any monthly compensation, pension, pay, annuity, or allowance paid under title 10, 37, or 38 in connection with a disability, combat-related injury or disability, or death of a member of the uniformed services*, except that any retired pay excluded under this subclause shall include retired pay paid under chapter 61 of title 10 only to the extent that such retired pay exceeds the amount of retired pay to which the debtor would otherwise be entitled if retired under any provision of title 10 other than chapter 61 of that title.

(emphasis added)

current monthly income, after deduction of amounts reasonably necessary for their maintenance or support, results in a negative number. Thus, they assert they have no "disposable income" to devote to unsecured creditors. Because their Social Security and VA disability benefits are statutorily excluded from "current monthly income," Debtors argue that those benefits should not be considered in assessing whether the plan was proposed in good faith. Debtors contend that their Social Security and VA disability income should only be considered for purposes of establishing the plan's feasibility and funding the required payments to secured and priority creditors, and to do otherwise would alter a longstanding practice of how this Court has handled excluded income in this district since the Fourth Circuit's *Mort Ranta* decision. *See Mort Ranta v. Gorman*, 721 F.3d 241 (4th Cir. 2013). Lastly, Debtors contend that the contribution of a portion of their excluded Social Security and VA disability income towards their mortgage expense allows Debtors to make a modest distribution to Debtors' unsecured creditors who would otherwise not be entitled to a distribution under § 1325(b)(1)(B) and is thus evidence of their good faith.

The Court is bound by Fourth Circuit precedent, including the decisions in *Mort Ranta* and *Goddard*, which the parties extensively addressed in their briefing and arguments. The application of those precedents, however, is necessarily fact intensive. Thus, the Court must examine how the principles articulated in those decisions apply to the circumstances presented here. The Court will first consider the relevant Fourth Circuit precedent and other authorities that the parties heavily relied upon in their arguments and will then analyze those principles in the context of the case before it.

*Mort Ranta v. Gorman*

In *Mort Ranta*, a below-median debtor with negative projected disposable income proposed a five-year plan requiring payments of $525.00 per month and providing for unsecured creditors

to receive less than 1% of their allowed claims. The debtor's schedule I reported combined average monthly income of $7,492.10, consisting of the couple's take-home pay and $3,319.00 in combined Social Security benefits. The debtor's monthly expenses were reported as $6,967.24, resulting in monthly net income of $524.86. The chapter 13 trustee objected to confirmation, arguing that the expenses listed on Schedule J were overstated and, consequently, that the debtor's disposable income was higher than it appeared to be. The debtor acknowledged that certain expenses were overstated but maintained that the plan nevertheless complied with § 1325(b)(1)(B). The debtor argued that Social Security income is excluded from the calculation of "disposable income" and that, even after adjusting the overstated expenses, they would still exceed his non-Social Security income. As a result, the debtor contended he was not required to make any payments to unsecured creditors. The bankruptcy court denied confirmation, and the district court affirmed.

On appeal, the trustee took the position that the definition of "disposable income" as revised by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2025 applies only to above-median debtors, not below-median debtors such as Mort Ranta. Second, the trustee argued that the Supreme Court's decision in *Hamilton v. Lanning*, 560 U.S. 505 (2010), allowed Social Security income to be included in "projected disposable income" even if excluded from "disposable income." The Fourth Circuit disagreed with both arguments, vacated the order affirming the denial of the plan confirmation, and remanded it to the district court. In so doing, the Fourth Circuit confirmed that the plain language of the Bankruptcy Code excludes Social Security income from the calculation of "projected disposable income" for both above-median and below-median income debtors, while holding that "such income must nevertheless be considered in the evaluation of a plan's feasibility." *Id.* at 243.

Addressing the trustee's concerns that excluding Social Security income from the calculation of projected disposable income for below-median income debtors could invite abuse, the Court concluded that "this is not necessarily so," explaining:

> It is true that a Chapter 13 debtor with zero or negative "projected disposable income" is not required to apply any income to payments to unsecured creditors under § 1325(b)(1)(B). ***The debtor's plan, however, still must satisfy every other requirement for confirmation set forth in the Code***. Among other requirements, the plan must meet the "best interests of the creditors" test, i.e., unsecured creditors must not receive less than they would in a Chapter 7 liquidation of the estate, 11 U.S.C. § 1325(a)(4), and the plan must have been proposed in good faith, *id.* § 1325(a)(3).

*Id.* at 252-53 (emphasis added).[34]

<u>*Goddard v. Burnett*</u>

In *Goddard,* an above-median income chapter 13 debtor proposed a plan under which the trustee would pay off secured debt on three recently acquired vehicles in full, while general unsecured creditors received a distribution of only 7.7% of their claims. *Id.* The debtor and his non-filing spouse's take-home income totaled approximately $12,000.00—a portion of which consisted of the debtor's VA disability benefits and retirement income from the U.S. Army. The debtor had purchased three vehicles during the thirty-two months prior to filing his petition, with total monthly payments of over $3,000.00. The debtor also owed approximately $85,000.00 in general unsecured debt, approximately $35,000.00 of which was attributable to loans taken out in

---

[34] In a footnote, the Fourth Circuit went on to note:

> [T]hat the exclusion of Social Security income from disposable income, as required by statute, **by itself,** does not constitute bad faith. *See In re Ragos,* 700 F.3d 220, 227 (5th Cir.2012) ("[R]etention of exempt social security benefits **alone** is legally insufficient to support a finding of bad faith under the Bankruptcy Code); *In re Cranmer,* 697 F.3d 1314, 1319 (10th Cir. 2012) ("When a Chapter 13 debtor calculates his repayment plan payments exactly as the Bankruptcy Code and the Social Security Act allow him to, and thereby excludes SSI, that exclusion cannot constitute a lack of good faith.").

*Mort Ranta*, 721 F.3d at 253 n.15.

2021 and 2022 around the same time he purchased the three cars. Under the "means test" formula used to calculate his "disposable income" to be used to pay unsecured creditors, the debtor was permitted to deduct from his monthly income his average monthly mortgage payment of approximately $2,500.00, as well as the average monthly payments on the three car loans. When the amounts for the payment of secured debt together with the other allowable expenses were deducted from his monthly income, the result was a *negative* $234.00.

The chapter 13 trustee objected to confirmation, arguing that because the plan provided for such a small disbursement to the debtor's general unsecured creditors while permitting him to retain three luxury vehicles, the plan had not been proposed in good faith. In response, the debtor argued that the good faith analysis of § 1325(a)(3) should not be invoked to challenge a debtor's retention of assets for which expenses are a permitted deduction on the means test under § 1325(b).

The bankruptcy court sustained the trustee's objection and denied confirmation, and the district court affirmed. The Fourth Circuit affirmed the lower courts, rejecting the debtor's argument that strict compliance with § 1325(b) precludes the bankruptcy court from considering whether the debtor's plan was proposed in good faith as required by § 1325(a)(3). *Id.* at 558. The Court reiterated that "bankruptcy courts remain charged with considering, under *all the circumstances*, whether the debtor's proposed plan would amount to 'an abuse of the provisions, purpose or spirit of the Chapter.'" *Id.* at 558-59 (quoting *Deans v. O'Donnell,* 692 F.2d 968, 972 (4th Cir. 1982)). The Fourth Circuit emphasized the broad scope of the good faith requirement—which reaches beyond mere compliance with the Code:

> [T]he concept of good faith is not fulfilled simply through technical compliance with the Bankruptcy Code's provisions. We have long recognized that "the basic inquiry" when assessing whether a plan has been proposed in good faith is "whether or not under the circumstances of the case there has been *an abuse* of the provisions, purpose, or spirit of the Chapter in the proposal or plan." *Deans v. O'Donnell*, 692 F.2d 968, 972 (4th Cir. 1982) (emphasis added) (cleaned up). . . . For instance, in

> discussing the good-faith requirement, we have observed that "Congress never intended ... [for] Chapter 13 [to] serve as a haven for debtors who wish to receive a discharge of unsecured debts *without making an honest effort to pay those debts.*" *Id.* (emphasis added). That inquiry is far broader than simply determining whether a debtor complies with the text of a provision, such as § 1325(b).

*Id.* at 557.

Debtors contend that *Goddard* is distinguishable from their cases because the debtor in that case was above-median income; thus, the court had less discretion to scrutinize the reasonableness of the debtor's claimed expenses because they were governed by the means test. In *Goddard*, the debtor was not contributing any of his excluded income to pay for the three cars—i.e., by including the vehicles expense in the means test calculation, the debtor significantly reduced the amount received by unsecured creditors while retaining the excluded income as a windfall. Here, Debtors contend they are not seeking to change what is received by unsecured creditors because those creditors are already entitled to receive nothing due to the budget deficit, and Debtors are contributing their excluded income to cover their mortgage expense. Because their income is below median, Debtors argue that the Court has the discretion to disallow unreasonable or excessive expenses, and the good faith requirement of § 1325(a)(3) does not provide an independent basis to require contribution of statutorily excluded income when the Court already has the authority to scrutinize the reasonableness of the claimed expenses. Their unwillingness to contribute excluded income as permitted by the statute, as Debtors posit, cannot be considered for purposes of determining good faith, and to do so would override the statutory exclusion through an expansive application of good faith.

The Court sees no basis for applying *Goddard* differently to above and below-median debtors because the relevant inquiry for purposes of this case is not one of the debtor's disposable income but of good faith. In both *Mort Ranta* and *Goddard*, the Fourth Circuit affirmed that the

good faith requirement of § 1325(a)(3) is a separate requirement for confirmation that is independent from the § 1325(b) analysis. *See Goddard,* 173 F.4th at 557 ("[I]t simply does not follow that eliminating discretion in the means-test calculation thereby eliminated the need for a good-faith assessment of a Chapter 13 plan"). "[W]hile compliance with the Bankruptcy Code's provisions may be required to show good faith, good faith reaches beyond mere compliance to assess whether a proposed plan, even if in technical compliance, would nonetheless abuse the provision's purposes or violate the spirit of Chapter 13 or the Bankruptcy Code more broadly." *Id.* at 557. Bankruptcy courts are instead directed to apply a holistic analysis—examining all of the circumstances to determine whether the debtor's proposed plan would amount to "an abuse of the provisions, purpose, or spirit of the Chapter." *Id.* at 558-59. This holistic, case-by-case analysis is required in *all* chapter 13 bankruptcy cases, not just cases filed by above-median debtors.

*In re Allawas*

During oral argument, both parties compared the current case to the facts in the *Allawas* case that this Court decided prior to *Mort-Ranta* and *Goddard.* The Trustee cited *Allawas* in support of her position, while Debtors contended that the outcome of that case would be different now.[35] In *Allawas*, this Court concluded that a debtor must, when challenged, demonstrate good faith to obtain confirmation of a plan under § 1325(a)(3) and (a)(7), even if the requirements of § 1325(b) are met. *In re Allawas*, No. 07-06058-HB, 2008 WL 6069662, at *4 (Bankr. D.S.C. Mar. 3, 2008). In *Allawas*, the below-median debtor's plan proposed to retain a 2005 Harley

[35] In 2019, as part of the Honoring American Veterans in Extreme Need Act of 2019 (the "HAVEN Act"), Congress amended 11 U.S.C. § 101(10A) to exclude from current monthly income "any monthly compensation, pension, pay, annuity, or allowance paid . . . in connection with a disability, combat-related injury or disability, or death of a member of the uniformed services . . . ." Pub. L. No: 116-52, 133 Stat. 1076 (Aug. 23, 2019). The Court does not believe that the outcome of *Allawas* would have been different if the debtor's VA disability income had been excluded from the disposable income analysis, given the other factors considered.

Davidson motorcycle in addition to another vehicle while paying 1% to unsecured creditors over a period of five years. The trustee objected on good faith grounds. The debtor's income was comprised of VA disability benefits of $2,000.00 a month, which at that time were not excluded from current monthly income, and Social Security disability income in the amount of $806.00. According to Schedule J, the debtor's expenses totaled $1,891.00, leaving a monthly net income of $915.00. The debtor did not own any real estate. The debtor proposed a plan payment of $640.00 to be funded with the funds available, the majority consisting of the Social Security income.

The debtor argued that her voluntary contribution of most of her Social Security disability income to fund the plan, although not required by the Code, was evidence of her good faith.[36] The Court found that the debtor had complied with § 1325(b). Nevertheless, the debtor was still required to meet her burden of proof to demonstrate her good faith under § 1325(a)(3) and (a)(7) by a preponderance of the evidence upon the trustee's objection to confirmation. *Id.* at 5. The Court examined the good faith factors and determined that the debtor had acted in good faith in filing the case but had not met her burden of proving that the plan was proposed in good faith. In reaching its conclusion, the Court noted:

> To clarify, this decision does not find that excess income, arguably resulting from excluded Social Security income, must be counted toward a debtor's current monthly income and thus towards his or her projected disposable income for the purpose of determining payment to unsecured creditors. The point is rather that a Chapter 13 debtor seeking the extreme relief of bankruptcy must also pass the good faith test of § 1325(a)(3).

[36] The Court noted:

> Despite exclusion from the projected disposable income test of § 1325(b), this Debtor has pledged a portion of her Social Security disability income to fund her plan. Debtor is proposing a monthly plan payment of $640 to be funded with $915 of actual projected funds available each month; $806 of those projected funds are from Debtor's Social security disability income.

*Allawas*, 2008 WL 6069662 at *2.

*Id.* at 6. The Court finds nothing in subsequent Fourth Circuit precedent, including *Mort Ranta*, that changes or undermines this holding. Nor does any subsequent precedent or changes in the definition of current monthly income support Debtors' contention that this Court should reach a different result.

<u>*In re Williamson*</u>

Debtors rely heavily on the non-binding opinion in *In re Williamson*, No. 22-60625, 2023 WL 2144534 (Bankr. N.D. Ohio Feb. 21, 2023) in support of their argument, because it is one of the few opinions that addresses the analysis of the good faith requirements for chapter 13 confirmation in the context of a below-median income debtor.

In *Williamson*, the bankruptcy court rejected the trustee's objection to confirmation of the debtor's chapter 13 plan and found that "the fact that the debtors chose not to include benefits under the Social Security Act as part of the proposed monthly payments in their chapter 13 plan [was] not a basis for finding a lack of 'good faith' under § 1325(a)(3)." *Id.* at *21. In that case, the debtors' combined monthly income was $5,013.91 including $2,621.00 in social security benefits, and they were below-median debtors. The debtors' monthly expenses were $1,129.00 per month. The bankruptcy court noted a strong consensus among lower courts that "a debtor's choice to rely upon the statutory exclusion of Social Security and not voluntarily offer all or some part of that income, is not a basis for finding a lack of good faith." *Id.* at 18 (citing cases). This view is similarly reflected in leading treatises on bankruptcy. *See* 8 COLLIER ON BANKRUPTCY ¶ 1325.04[1] (16th ed. 2022) ("Considering a debtor's exclusion of Social Security income from plan payments as part of the good faith analysis would improperly render § 1325(b)'s ability to pay test, which incorporates the term 'current monthly income,' meaningless."); Keith M. Lundin, *Lundin On Chapter 13*, § 12.5, at ¶ 6, LundinOnChapter13.com (last visited Aug. 21, 2026)

("Thus, for confirmation purposes, debtors need not include in [current monthly income] Social Security benefits—putting those benefits beyond the entitlement of unsecured creditors at confirmation under § 1325(b).").

To be clear, this Court does not disagree with this general view. However, as the court in *Williamson* also acknowledged, a bankruptcy court must still consider all the circumstances presented in each case to determine good faith. In *Williamson*, the bankruptcy court observed that the trustee had also raised a lack of good faith based upon other factors[37] and set a further evidentiary hearing to determine whether there were other grounds that would allow the court to find a lack of good faith.[38] That is exactly what *Goddard* requires and how the Court will proceed.

*Good Faith Analysis Under Section 1325(a)(3) and (a)(7)*

"Proposing a plan in good faith under § 1325(a)(3) entails 'mak[ing] an honest effort to repay [the debtor's] creditors, for the underlying purpose of a Chapter 13 plan has always been 'the sincerely intended repayment of pre-petition debt consistent with the debtor's available resources.'" *Sherrod*, 660 B.R. at 789 (quoting *In re McGillis*, 370 B.R. 720, 750 (Bankr. W.D. Mich. 2007)). To determine good faith, the Fourth Circuit has instructed courts to examine the totality of the circumstances on a case-by-case basis, including the following non-exclusive, relevant factors: (1) the percentage of proposed repayment, (2) the debtor's financial situation, (3) the period of time payment will be made, (4) the debtor's employment history and prospects, (5) the nature and amount of unsecured claims, (6) the debtor's past bankruptcy filings, (7) the debtor's

---

[37] The Trustee in *Williamson* had also alleged a lack of good faith based upon the number of prior bankruptcy cases filed by the Debtors, and failure to file an updated Form 122C-1 after disclosing additional pension income, allegations of unlisted creditors, and misstated amounts in their schedules based on a reconciliation of the bank statements with what the Debtors listed. Notably, although not mentioned by Debtors in their pleadings, the court's docket in *Williamson* reflects that, following the entry of the order denying confirmation, the plan was amended to propose a higher monthly payment to general unsecured creditors as part of a settlement with the chapter 13 trustee and was ultimately confirmed.

[38] *In re Williamson*, No. 22-60625, ECF No. 35 (Bankr. N.D. Ohio May 5, 2023).

honesty in representing facts, and (8) any unusual or exceptional problems facing the particular debtor. *Deans v. O'Donnell*, 692 F.2d at 972. Courts in this district have also considered the debtor's pre-filing conduct as an additional factor. *See Pizzo*, 628 B.R. at 818. "Courts analyzing the good faith of a debtor [in the filing of the chapter 13 petition] under § 1327(a)(7) have employed a "totality of the circumstances" test similar to the one employed for § 1325(a)(3)." *Sherrod*, 660 B.R. at 790.

An analysis of the good faith factors in this case follows:

*a. Percentage of Proposed Repayment and Period of Time Payment Will Be Made*

Because they are not required to pay any amount to their unsecured creditors under § 1325(b)(1), Debtors assert that their contribution of a portion of their Social Security and VA disability benefits to pay their mortgage, which enables Mitchell to pay 3.6% and Lighty to pay 2.6% of their respective general unsecured claims, is evidence of their good faith. Although as below-median income debtors they would only be required to fund a plan over a three-year period, Debtors' plans propose payments over a five-year period, stretching payments on their vehicles over that period to allow them to retain and pay for a home worth more than $800,000.00 and have considerable leftover income each month.[39] Meanwhile, their creditors wait to receive full payment on their claim. As discussed more fully below, Debtors incurred a substantial amount of unsecured debt in the two-year period prior to filing their bankruptcy cases. Any good faith to be found in Debtors' voluntary promise of repayment of a minimal amount to unsecured creditors is outweighed by the extended repayment period, the minimal amount of repayment compared to the

[39] The Court notes that the refinancing agreement from the Jeep intends for payments on the Jeep to be completed in September 2031, however, under Mitchell's Plan, which proposes to pay the Jeep in full, payments are to be completed in March 2031. Therefore, the payments on the Jeep appear to not be stretched out. However, there is no proof of claim regarding the Jaguar and according to the schedules the loan was opened in February 2023, accordingly it appears that the payments on the Jaguar are most likely being stretched out.

amount of debt, and the amount of debt incurred shortly before filing. Here, these factors weigh slightly in favor of a finding that Debtors' plans were not proposed in good faith.[40]

*b. Debtors' Financial Situation, Employment History, and Prospects*

Although Debtors' exact ages were not disclosed in documents filed with the Court or during trial, based on the record before it and its observations, Debtors appeared in overall good health. Lighty is retired and has not indicated any intention to return to work. Mitchell is also retired but has recently incurred additional debt in pursuit of further education for a second career in marketing. Mitchell is uncertain what that career will be, and it will take approximately two more years to complete a degree. Mitchell did not indicate any employment prospects at this time. Mitchell's lack of academic success thus far indicates completion of a degree is uncertain. Debtors' bankruptcy filings do not appear to be caused by any fluctuations in income.

Debtors' monthly expenses as shown on Schedule J appear inflated. Debtors have a food and housekeeping supplies expense of $944.00 per month for a household of two, as well as transportation expense of $500.00 and vehicle insurance cost of $906.71 per month for two vehicles, despite the fact that they have two other vehicles and do not need both vehicles for the production of income or other stated reasons. Debtors have a large home with monthly mortgage payment of $4,999.86, comprising approximately one-third of their combined total income (including their Social Security and VA disability income) and 77% of their current monthly income under 11 U.S.C. § 101(10A). The home was built and the associated secured debt of approximately $640,000.00 (in addition to other unsecured debt) was incurred within a two-year period before filing. The construction and maintenance of that home precipitated additional

[40] To be clear, the Court acknowledges that the relevance of the first factor—the proposed percentage repayment—has been narrowed by Congress's adoption of the means test and exclusion of certain income from "disposable income." However, it is only when that factor is taken "alone" and as the primary consideration in the "good faith" analysis that it becomes a problem. *See Mort Ranta*, 721 F.3d at 253 n.15.

expenses, causing Debtors to incur additional credit card debt to make ends meet, incurring approximately $100,000.00 in unsecured debts, plus an additional $100,000.00 in debt associated with the construction of a pool during that time. Debtors' bankruptcy cases appear to have been filed because they incurred a large amount of debt in a short period of time, and not as a result of a pending foreclosure action or vehicle repossession.

Lighty also has a rental property but no equity in it due to multiple refinancings and modifications of the mortgage over the past five years. Notably, Debtors were unable to explain why the principal balance on the mortgage on the rental property had increased by over $100,000.00 since 2022, despite Lighty's assertions that he had not received any funds from the refinance transactions. Moreover, in the year prior to filing her bankruptcy case, Mitchell obtained a title loan of $25,123.77 on her 2020 Jeep, which had been previously free of liens, thereby eliminating any equity in that vehicle. She used the proceeds of this loan to pay credit card debts and received $5,369.00 in cash. This loan has a high annual percentage rate of 26.77% and requires Mitchell to make monthly payments of $704.30.

By refinancing the rental home and encumbering the Jeep, Debtors consumed assets that would be considered when calculating the amount of money they would be required to pay into a chapter 13 plan for the benefit of their creditors. *See* 11 U.S.C. § 1325(a)(4). Accordingly, these factors weigh against a finding of good faith.

*c. Nature and Amount of Unsecured Claims and Pre-Filing Conduct*

Lighty has total scheduled unsecured debt of $82,671.45, the majority of which is credit card debt. Approximately one-third of this debt was incurred since 2024. Mitchell has total scheduled unsecured debt of $95,125.00, which is comprised of a mixture of credit card, medical,

student loans and other personal loans.[41] According to Debtors' schedules and the dates listed therein, more than 80% of this debt was incurred in the past two years. Debtors testified that their credit cards were used to purchase furniture and other items for their home and pay their living expenses, and those debts got out of control. In 2024, Mitchell also incurred secured debts totaling approximately $95,000.00 from Foundation Finance Company to finance the construction of a pool on the Sheffield Drive Property, which she proposes in the plan to value at $3,000.00, leaving unsecured claims totaling $94,260.71 for this creditor. Mitchell also owes significant tax debts to the Internal Revenue Service for income taxes due from 2020 to 2026 in the total amount of $79,242.98. While Mitchell testified that she received misinformation on how to roll over an IRA account which caused her to incur significant tax obligations for 2020, she did not explain her failure to pay taxes for 2020 through 2025 or her failure to pay the South Carolina Department of Revenue for 2024 and 2025 taxes in the amount of $8,252.09. Incurring substantial secured and unsecured debts during a period when the debtor has significant unpaid tax debts also tips the scales in finding lack of good faith. As the court indicated in *Allawas*, debtors can purge such bad faith by filing a bankruptcy petition in good faith and proposing a plan to remedy their unwise financial decisions. *See Allawas,* 2008 WL 6069662, at *4. Debtors' proposal to retain two homes while paying a minimal distribution to unsecured creditors and stretching payments to other creditors over a five-year period, when Debtors have the ability to pay more and more quickly—albeit with income they are not compelled to pay—is insufficient to overcome the suggestion of bad faith. These factors indicate that the plan was not proposed in good faith.

---

[41] According to the proofs of claim filed in Mitchell's case, she has $120,452.43 in general unsecured claims.

*d. Debtors' Past Bankruptcy Filings*

Lighty has a prior chapter 13 bankruptcy case, C/A No. 17-00361, which ended with a discharge on February 16, 2022. In the prior case, Lighty discharged $82,208.24 in unsecured debts, after paying only 11.9% of unsecured claims. While the prior bankruptcy case was pending, Lighty testified that he purchased the lot for the Sheffield Drive Property with cash and transferred his interest in the lot to Mitchell. Within a few months of receiving a discharge, Lighty began incurring additional unsecured debts by using credit cards. These facts weigh in favor of finding that Lighty's plan was not proposed in good faith. Mitchell does not have a prior bankruptcy filing, so this factor is neutral as to her plan.

*e. Debtors' Honesty in Representing Facts and Any Unusual or Exceptional Problems Facing the Debtors*

The Trustee has not asserted that Debtors have been dishonest in representing the facts of this case but did assert that Debtors were not fully responsive to several of the Trustee's questions. Although Debtors testified that they did not incur their debts with the intention of filing bankruptcy to discharge them, their conduct could lead to a different conclusion, particularly in light of Lighty's familiarity with the process having personally received a bankruptcy discharge in 2022. Moreover, there were a few inconsistencies between Debtors' schedules, testimony, and proof of claims. Lighty could not provide sufficient explanation as to the refinancing of the Hallie Drive Property and why loan increased by $100,000.00. His testimony that the refinancing was done to lower the interest rate was not supported by the loan documentation in evidence. Lighty testified that he had transferred an interest in the Hallie Drive Property to Mitchell, but the tax and mortgage records indicate that he is the sole owner of that property. Debtors testified that they were paying their bills on time for the first two years after building the house; however, as her schedules reflect, Mitchell had substantial unpaid tax debt during that same time period and Mitchell did not fully

explain why she had not paid her taxes from 2021-2025. No evidence was presented of any unusual or exceptional problems facing the Debtors. These factors weigh slightly in favor of the Trustee.

**CONCLUSION**

The applicable burden when considering confirmation of a chapter 13 plan under 11 U.S.C. § 1325 is preponderance of the evidence. *Sherrod*, 660 B.R. at 790 (citing *Pizzo*, 628 B.R. at 818; *In re Allawas*, 2008 WL 6069662, at *3). Under that standard, when a debtor's good faith in filing a plan or the case is being challenged, the Court must determine whether, considering the evidence presented, the existence of the facts supporting a finding of good faith is more likely than not. The standard does not require a debtor to establish good faith by clear and convincing evidence. Rather, the question is whether, when the evidence is considered in its entirety, the scales tip in favor of a finding that the proposed plans satisfy § 1325(a)(3). Here, they do not.

The Court acknowledges that the facts present a close call. However, after careful consideration of the evidence and the record as a whole and taking into consideration the totality of circumstances, the Court finds that Debtors have failed to present sufficient evidence to tip the scale in their favor. Based on the evidence presented, the Court cannot conclude that Debtors are treating their creditors fairly or making an honest effort to repay their creditors. To be clear, no single fact identified in the record by itself—such as Debtors living in a home with an estimated value of nearly $900,000.00, having a mortgage payment of $5,000.00, or not paying more to their unsecured creditors from excluded income—compels the Court's conclusion. Rather, the Court has considered the totality of the circumstances presented and weighed the evidence in reaching its conclusion.

After considering the record as a whole, including the documentary evidence admitted at trial, Debtors' testimony, and the Court's observation of the witnesses, the Court finds that Debtors have not established by a preponderance of the evidence that their respective proposed plans were filed in good faith as required by 11 U.S.C. § 1325(a)(3). However, given that these cases were filed only days after the Fourth Circuit's *Goddard* decision and its application to below-median income debtors was arguably uncertain, the Court makes no finding at this time regarding whether Debtors were acting in good faith in the *filing* of the petition under § 1325(a)(7).

For the foregoing reasons, confirmation of the chapter 13 plans that Debtors proposed in their respective cases is DENIED. Debtors may file amended plans within ten (10) days of the entry of this Order. Failure to file an amended plan in each of Debtor's chapter 13 case and serve it pursuant to the requirements of SC LBR 3015-2 by the deadline imposed herein may result in the dismissal of their respective case without further notice and a hearing.

**AND IT IS SO ORDERED.**

**FILED BY THE COURT**
**08/24/2026**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF SOUTH CAROLINA

Entered: 08/24/2026

Elisabetta G. M. Gasparini
US Bankruptcy Judge
District of South Carolina